ADAMS, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| STEPHEN G. THOMAS, *etc*., *et al*., | ) | |
| | ) | CASE NO. 1:04CV2150 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Judge John R. Adams |
| | ) | |
| CITY OF SHAKER HEIGHTS, *et al.*, | ) | MEMORANDUM OPINION & ORDER |
| | ) | [Resolving Docs. 65 & 66] |
| Defendants. | ) | |
| | ) | |

## I.  Introduction

This matter is before the Court on two motions for summary judgment filed by the Defendants to this action.  The first motion was filed by Defendant the City of Shaker Heights ("the City").  The second motion was filed by the individual Defendants who are Chief of Police Walter A. Ugrinic, Officer Timothy Kohanski, Officer Thomas Clementi, dispatcher Andrew McMillin, jailer Leonard Piazza, and Director of Health, Scott Howard Frank, M.D.  Both motions were timely opposed by Plaintiffs Stephen G. Thomas, administrator of the estate of Geraldine McShane-Fitzmartin, and Jennifer Fitzmartin.  The Court has been advised, having reviewed the parties' pleadings; motions, oppositions, and replies thereto; attached exhibits; and applicable law.  For the reasons set forth herein, both motions are GRANTED in part and DENIED in part.

## II.  Statement of Facts[1]

On November 4, 2002, Geraldine McShane-Fitzmartin ("the decedent"), was arrested on charges of domestic violence after her husband had called the police alleging that she tried to attack him with a kitchen knife.  The decedent, who chronically abused alcohol, was then transported to the Shaker Heights jail with a blood alcohol content ("BAC") of .342.[2]  The jail has a policy in place for interviewing and screening detainees for medical problems.  The decedent was screened and filled out a jail medical screening form, which asked a variety of

---

[1] The Court has cited to various conversations from the transcripts, which were submitted as evidence in this case.  The two transcribed versions that were attached as exhibits vary slightly; however, there are no substantive differences between them.

[2] "[A] BAC rating of 0.20 represents very serious intoxication . . . , and 0.35 represents potentially fatal alcohol poisoning. . . ."  Blood Alcohol Concentration, *The American Heritage Stedman's Medical Dictionary*, Houghton-Mifflin Company, 2002.  Evidence that the decedent's BAC was at a potentially dangerous level can be seen from the following conversation between dispatcher Brian Walsh and Officer Michael Rowe:

| | |
|---|---|
| ROWE: | Guess what she blowed? |
| WALSH: | Point 21? |
| | *** |
| ROWE: | No. |
| WALSH: | What? |
| ROWE: | You're not even close. |
| WALSH: | What? |
| ROWE: | Guess. |
| WALSH: | Higher? |
| ROWE: | A little bit. |
| WALSH: | Point 28. |
| ROWE: | A little bit higher. |
| WALSH: | Are you kidding me? |
| ROWE: | No. |
| WALSH: | Three. |
| ROWE: | Little bit higher. |
| WALSH: | Three, five. |
| ROWE: | It went up to a three six, but she registered at three, four, two. |
| WALSH: | Three, four, two.  Can you believe that? |
| ROWE: | She should be dead. |
| WALSH: | Yeah, she should be dead.  She's (inaudible) herself. |
| | * * * |
| WALSH: | That's a record. |
| | * * * |

2

questions regarding her medical history.  On this form, she indicated that she was under a

doctor's care for cancer, had diabetes and heart disease, and she listed five prescription

medications that she was taking.  The screening officer observed that the decedent appeared

under the influence of alcohol or drugs and that she was confused as to time, place, or person.

The screening officer also indicated that the decedent was to be under constant observation.

However, neither the screening officer nor any of the officers involved in the decedent's care had

received any medical training in how to administer the screening procedures and they were not

trained in the protocols in place to govern the medical care of detainees.

At some point in time, officers were sent to the decedent's home to pick up her

prescription medicine.  When the decedent was placed into her cell, she was monitored by

closed circuit television and she was checked in person various times throughout the night and

early morning hours of November 5, 2002.  At one point during the night, the decedent was

observed on the floor of her cell breathing and moving, but with something in her mouth.[3]  Non-

party Officer John Catena called for an Emergency Medical Services ("EMS") squad and entered

the cell.  However, the squad was cancelled because Catena did not believe that the decedent

required emergency medical attention.[4]

---

[3] It is unclear whether the decedent had a sock in her mouth or a foam slipper.  Most of the testimony indicates that the decedent had a sock in her mouth; however, some testimony indicates that it was a foam slipper.

[4] The following conversations took place between dispatcher Brian Walsh, Officer Rowe, Officer Catena, and the fire dispatcher:

| WALSH: | 287 needs assistance with that female.  She's laying on the cell block floor. |
| | *** |
| ROWE: | Said she's laying on the floor and doing what? |
| WALSH: | All right.  She got up.  She looked like she was ralphing.  The next thing, I looked up, she's flat on the ground. . . . So, I'm gonna send a squad over. |
| ROWE: | He hasn't gotten a response?  He's in the cell block? |

3

Later, the officer in charge, non-party Sergeant John Boykin advised non-party Officer Michael Rowe to call Defendant Scott Frank, M.D., who was the medical director, to ask him about the decedent's long list of prescription drugs.  Frank gave Rowe the authority to administer the medications to the decedent.  Rowe, however, did not advise Frank that the decedent had an elevated BAC and admitted in his deposition that he was unaware that he should communicate this information to the doctor.  Rowe also did not inform the doctor that the decedent was observed on the floor with a sock in her mouth.  Frank never inquired as to whether the decedent was taking drugs or drinking alcohol.[5]

---

| | |
|---|---|
| WALSH: | No, he hasn't opened up her door yet.  He's screaming for her.  And she's -- Well, I'm watching her on the camera.  Her hand's moving, but -- |
| ROWE: | Yeah.  She's f**king hammered. |

***

| | |
|---|---|
| WALSH: | She's stuffed a sock in her mouth and she's laying on the ground. |
| ROWE: | She what? |
| WALSH: | She stuffed a sock in her mouth.  She's laying on the ground, so you asked for the squad to come. |

***

| | |
|---|---|
| CATENA: | Cancel the squad, she's alive. |
| WALSH: | All right. |

***

| | |
|---|---|
| WALSH: | You can tell them to disregard. |
| FIRE DISPATCHER: | Oh, they're already there.  You don't want them at all? |
| WALSH: | No.  I see them pulling up now.  No.  They called, they said disregard. |

***

| | |
|---|---|
| WALSH: | She's just intox. |

[5] The brief conversation between Officer Rowe and Dr. Frank was as follows:

| | |
|---|---|
| ROWE: | We arrested a 57 year old female for domestic violence.  She threatened her husband with a knife.  Actually put it to his chest and threatened to kill him.  Just to advise you, she's under doctor's care for, well, according to her, several difficult things and she takes nine medications.  I can list them for you.  She says she's a cancer survivor, says she's got diabetes but she doesn't take insulin. |
| FRANK: | How old is she? |
| ROWE: | Fifty seven. |
| FRANK: | Uh-huh. |
| ROWE: | And we just want you to be advised of the medication she's taking. . . . |
| FRANK: | Okay. |
| ROWE: | I don't know all of them.  I mean she takes Zoloft, Tania, Moxyfin, Tresenodoine. |

4

The following morning, the decedent was brought to court for the domestic violence charge.  She was not feeling well and was transported to a holding cell.  An EMS squad was called.  The emergency medical technicians found that the decedent was oriented as to person, time, and place.  She did not appear to be in acute distress.  Nevertheless, they offered to transport her to the hospital.  The decedent, however, did not want to go to the hospital and declined medical care in writing.

Shortly thereafter, the bailiff at the court checked on the decedent to make sure she was all right.  The decedent stated that she was all right and that she did not need anything.  Upon hearing that the decedent refused medical care, non-party Judge Daniel Lovinger issued a court order that the decedent have a psychiatric examination at St. Vincent Charity Hospital.  The decedent was transported to the hospital by Defendants Kohanski and Clementi.  Her mental state appeared normal.  She told Clementi that she did not want to go to the hospital.  At the hospital, she was permitted to move about freely and make phone calls.

The decedent was seen by Frances Elliot, R.N.  According to Elliot, the decedent was shaking, but did not appear drunk.  Rather, she was alert, oriented and articulate.  Nevertheless, the decedent's BAC was still high (.251) and the hospital staff advised Kohanski and Clementi that a psychiatric evaluation could not be performed until her BAC was at a .10 or below.  Kohanski and Clementi called their supervisor, non-party Sergeant Danko.  Danko called another

---

| FRANK: | Tresidone. |
| ROWE: | Yeah.  It's hard to read this writing here.  Prevacid. |
| FRANK: | Prevacid. |
| ROWE: | Plavix, Amyrol.  A-M-E-R  -- Amarol, Turocinide, Endoset, and B-I-L-T-A-Z-E-N. |

* * *

| FRANK: | Okay.  Those are all fine. |

* * *

5

officer to see what to do and he was told that the normal procedure was to bring the prisoner back to the jail until his or her BAC dropped to the appropriate level and then take the prisoner back to the hospital for the evaluation.  Before advising Kohanski and Clementi to bring the decedent back to the jail, however, he called the court and spoke to non-party Chief Bailiff Walter Ratcliffe.  Ratcliffe, in turn, spoke to Judge Lovinger, who ultimately issued an order stating that the hospital was unable to perform the evaluation and directing the probation department to contact a psychologist for a psychiatric and drug/alcohol evaluation.

After being advised of the court's order over the phone, Kohanski and Clementi asked that the decedent be discharged.  Kohanski and Clementi appear to have known that the discharge was "Against Medical Advice" ("AMA").[6]  Upon realizing this, Clementi called back to the police department for further guidance.  Clementi spoke to Defendant dispatcher Andrew McMillin and advised him that the decedent needed to be evaluated, but that she would be released if they signed a form taking custody and responsibility for her.  McMillin, in turn, asked Danko if Kohanski and Clementi should sign the decedent out of the hospital.  Danko advised McMillin that they should sign her out.  Accordingly, Clementi signed the release form and the two brought the decedent back to the jail.

At some point in time, after the decedent had been transported back to the jail, the decedent's husband, Arthur Fitzmartin, called the jail and spoke to the dispatcher.  Fitzmartin inquired of the decedent's status and was informed that she could not be evaluated until her BAC decreased.  He specifically mentioned his wife's cirrhosis and was assured that she would be

---

[6] Judge Lovinger, however, testified in his deposition that he would not have released the decedent had he known the release was AMA – a fact that was never presented to him.

6

taken care of appropriately.[7]  Despite his request, neither her condition nor her BAC were ever communicated to the doctor.

At the jail, the decedent was periodically monitored on closed circuit television and through periodic checks.  On the morning of November 5, 2002, Defendant Piazza approached the decedent to administer her medications and give her breakfast when he discovered she was dead.  Pictures of the decedent taken after she was discovered dead in her jail cell show that she was sweating prior to her death.

The coroner's report indicates that the decedent died from chronic ethanol abuse and fatty cirrhosis.  However, Plaintiffs' expert, Dr. Robert Cohen, stated that the probable cause of death was likely an electrolyte imbalance, which was caused from undiagnosed Alcohol Withdrawal Syndrome ("AWS").[8]  Notwithstanding, Defendants' expert, Dr. Rolf F. Barth,

---

[7] The conversation between Fitzmartin and the police department was as follows:

| | |
|---|---|
| FITZMARTIN: | What are you going to keep her, overnight? And take her back down there? |
| DISPATCHER: | I don't know what they're going to do, sir.  I just got in. |
| FITZMARTIN: | Can I talk to somebody in charge? |
| DISPATCHER: | Hold on, sir.  Just a minute. . . . Okay, I was just informed by my partner that they're just going to wait for her blood alcohol level to go down by one and they'll take her back . |

* * *

| | |
|---|---|
| FITZMARTIN: | Are you going to be talking to anybody there or can you? |
| DISPATCHER: | Yes. |
| FITZMARTIN: | Just tell them to get a hold of the doctor, she has cirrhosis of the liver and that - - with a lot of food, the liver doesn't function properly, so the alcohol level doesn't go down as fast as it should, you know what I mean? |
| DISPATCHER: | Um-hum. |
| FITZMARTIN: | I don't know if they're aware of that or know. |

* * *

| | |
|---|---|
| DISPATCHER: | Yes, sir.  Okay.  I will pass this on to my Lieutenant. |

[8] AWS is a condition from which those who chronically abuse alcohol can suffer when their alcohol levels recede after prolonged abuse.  The signs of AWS include the following:  (1) shakes or tremors; (2) increased heart rate or palpitations; and, (3) excessive sweating.  If it progresses, AWS can lead to delirium tremens and seizures.  AWS can also result in "sudden death," which is a synonym for cardiac arrhythmia resulting from electrolyte imbalances.

7

advanced an alternative theory that the decedent's death was caused by cardiomegaly, which is an enlarged heart.  Their other expert, Assistant Cuyahoga County Coroner Frank P. Miller, M.D., stated that the decedent's death was "suggestive of an electrolyte or electrochemical imbalance" assuming she had no heart disease symptoms.  In his deposition, however, he testified that while alcohol withdrawal was a possibility, the scene examination, history and autopsy reports were not consistent with major alcohol withdrawal.  But, he later admitted that his opinions and autopsy findings were made without reviewing the records that the decedent evidenced tremors and sweating at her visit to St. Vincent Charity Hospital the day before her death.

The jail has standard medical protocols that list AWS as a condition that produces symptoms requiring immediate medical attention.[9]  Although the jail maintained a manual of medical protocols for reference at the jail regarding AWS, none of the officers could recall having ever read the manual.  They also admitted that they were neither required to study it nor ever trained or tested on its contents.  The City's records show that the officers' only medical training was to secure CPR certification.

Plaintiffs filed this action almost two years later.  Throughout the course of the

---

[9] The policy states that the Health Department should be notified when prisoners demonstrate symptoms of mental illness or anxiety because alcohol withdrawal can cause many of the same symptoms.  The policy also states that any prisoner who is drunk should be considered as a possible alcoholic.  It lists those symptoms that signify a need for immediate medical attention and notes that untreated withdrawal can cause numerous medical emergencies.
    The symptoms of alcohol withdrawal are listed as: (1) shakes or tremors; (2) rapid heart beat; (3) excessive sweating; (4) pacing or hyperactive behavior; (5) headache; (6) hallucinations; (7) seizures; and, (8) delirium tremens, which is noted as severe mental confusion or lack of touch with reality.  The policy states that if a prisoner is suspected of experiencing alcohol withdrawal, the Health Department should be contacted for instructions for safe withdrawal.

proceedings, various claims and Defendants were dismissed, either by the Court or the parties. The claims remaining, which are the subject of the motions at issue are Plaintiffs' civil rights claim for deliberate indifference and their state law claims for wrongful death, willful or wanton misconduct, and conscious pain and suffering.

### III.  Legal Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The court is to determine "whether there is the need for a trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  Importantly, the court views the evidence of record and draws all reasonable inferences in the light most favorable to the nonmoving party. *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).

Summary judgment is appropriate if the party that bears the burden of proof at trial does not establish an essential element of its case. *Tolton v. Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original).  In order for there to be a genuine issue for trial, there must be sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  *Id.* at 249.  Having discussed the Rule 56 standard of review, the Court

9

now turns to the merits of Defendants' motions.

### IV.  Plaintiffs' Federal Claim

Plaintiffs must prove two elements to recover under Section 1983.  They must prove that Defendants have deprived them of a right secured by the Constitution and they must prove that Defendants deprived them of that right under color of state law.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970).  Plaintiffs base their claim on Defendants' alleged failure to provide the decedent with adequate medical care while being held as a pretrial detainee.  It is the Eighth Amendment that requires the government to provide medical care for those who are incarcerated, *Estelle v. Gamble*, 429 U.S. 97, 103 (1976); however, the Eighth Amendment does not apply to pretrial detainees because the state has not secured a formal adjudication of guilt, *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983).  Rather, it is the Fourteenth Amendment that affords pretrial detainees the right to adequate medical treatment, which is analogous to the Eighth Amendment right afforded to prisoners.  *See Graham v. County of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004).

Defendants do not dispute that the right to adequate medical treatment is a right secured by the Constitution and they do not dispute that they were acting under color of state law.  Rather, they argue Plaintiffs cannot prove their claim of deliberate indifference.  In order to prove a claim of deliberate indifference, Plaintiffs must satisfy a two-prong test that contains an objective and subjective component.  The objective component requires that Plaintiffs allege that the medical need at issue was sufficiently serious.  *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).  The subjective component requires that Plaintiffs demonstrate that Defendants acted with sufficiently culpable states of mind.  *Miller v. Calhoun County*, 408 F.3d 803, 813 (6th Cir.

10

2005).  Deliberate indifference is greater than negligence, but less than "acts or omissions for the very purpose of causing harm or with knowledge that harm will result."  *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)).  The state of mind must evince "deliberateness tantamount to intent to punish."  *Id.* (quoting *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994)).  Plaintiffs must show that these Defendants had knowledge of the serious needs or of those circumstances that clearly indicated the existence of such needs.  *Id.*

## A.  The City

The City moves for summary judgment on the grounds that it had no custom or policy of disregarding the substantial risk of serious harm resulting from the medical needs of its pretrial detainees and that it did not have a policy of failing to train its officers so that they were deliberately indifferent to the serious medical needs of its prisoners. The City first argues, however, that Plaintiffs cannot prove that there was an underlying constitutional violation, which is a prerequisite to their Section 1983 claim.  It argues that the evidence in the record would simply not permit a jury to conclude that the officers involved in the decedent's care were aware of any facts from which the inference that the decedent faced a substantial risk of serious harm could be drawn and that there is nothing in the record to show that they actually drew such an inference.

The Court, however, disagrees.  There is certainly evidence in the record from which a jury could conclude that the officers involved in the decedent's care were aware of facts from which the inference that the decedent faced a substantial risk of serious harm could be drawn. The record clearly demonstrates the following facts: (1) the decedent gave her medical history when she was brought into the jail, which alerted the prison officials of her serious medical

11

conditions; (2) she was not oriented as to person, place, or time when she gave her history to the intake officer; (3) the decedent's husband called the jail and specifically asked that someone get a hold of a doctor because the decedent had cirrhosis and because her liver could not process alcohol because of it; (4) everyone involved in the decedent's care knew that her BAC was extremely high and was at an arguably dangerous level; (5) they also knew that the decedent was on a list of medications for various ailments; (6) the decedent was observed on the floor with a sock in her mouth in some type of apparent distress, even if only momentarily; (7) the decedent complained of feeling ill the next day at court and she had "the shakes"; (8) the decedent was taken to the hospital and released AMA, a fact that was never communicated to the judge who ordered her release; and, (9) the post-mortem photographs that were taken of the decedent show that she was apparently sweating profusely prior to her death.  Certainly, these facts would permit a jury to conclude that the officers involved in the decedent's care were aware of facts that would alert them that the decedent faced a substantial risk of serious harm.  It is immaterial whether Defendants knew that the decedent was suffering from AWS or whether the ultimate cause of death was an electrolyte imbalance because "[a] prison official is not free to ignore obvious dangers to inmates, and may be liable even if he does not know the exact nature of the harm that may befall a particular inmate."  *Davis v. Brian*, No. 98-1810, 1999 WL 503522 (6th Cir. July 9, 1999) (citing *Farmer*, 511 U.S. at 843-44).

There is also evidence in the record that those involved in the decedent's care actually drew the inference that she faced a substantial risk of serious harm.  There are numerous references throughout the record regarding how high the decedent's BAC was and those comments indicate that a BAC of .342 was not routine and was dangerous.  Furthermore, when

12

the decedent was observed on the floor with a sock in her mouth the officers must have appreciated some risk of harm because the paramedics were called (although they were cancelled shortly thereafter by an officer with admittedly little or no medical training).  Likewise, some risk of harm must have been appreciated when the decedent was at court the following morning and complained that she was feeling ill because the paramedics were once again called to the scene.  Lastly, some risk of harm must have been appreciated when the decedent was signed out of the hospital AMA.  The record is also replete with somewhat derisive comments about the decedent, which can go to the subjective mental state of those involved in her care.  These facts could certainly allow a jury to conclude that the decedent's constitutional rights were violated because Defendants were deliberately indifferent to her serious medical needs.

### 1.   Policy or Custom

Notwithstanding, the City argues it cannot be liable under Section 1983 for an unconstitutional policy or custom because Plaintiffs are unable to show that the City had implemented a policy or custom that was the moving force behind the alleged violation.  *See generally Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978) (noting that liability under Section 1983 attaches only when the execution of a policy or custom causes the injury).  To prevail on their claim, Plaintiffs must "identify the policy, connect the policy to [the City] itself and show that the particular injury was incurred because of the execution of that policy." *Coogan v. City of Wixom*, 820 F.2d 170, 176 (6th Cir. 1987).  The Court agrees.

Plaintiffs have not identified a policy that caused the decedent's injury.  Rather, they argue that liability attaches from Defendant Frank's role as a policy maker and his apparent failure to implement a policy regarding AWS for the jail.  However, even on this theory,

13

Plaintiffs cannot prevail because in order to state a municipal liability claim under an "inaction" theory, Plaintiffs must establish (1) the existence of a clear and persistent pattern of deliberate indifference to pretrial detainees suffering from AWS (or other alcohol related problems); (2) show that the City had constructive notice of this clear and persistent pattern of deliberate indifference; (3) show the City's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) show that the City was the "moving force" or direct causal link in the constitutional deprivation. *Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996).  Having examined the record, the Court finds that Plaintiffs are unable to show that the City's failure to act amounted to an official policy of inaction because there is no evidence of a clear and persistent pattern of deliberate indifference.

> ### 2.     **Failure-to-train**

The City also argues that it cannot be liable under Section 1983 for failure-to-train because Plaintiffs are unable to establish that the City had a policy of failing to train its police force to be deliberately indifferent to the serious medical needs of pretrial detainees.  According to the City, it's training procedures were based upon a template provided by the State of Ohio and were adequate.  It further argues that there is no evidence that the training provided to the police and jailers amounted to a policy that was objectively inadequate.

The Court disagrees.  In order to establish a claim for failure-to-train, Plaintiffs must establish the following: (1) the City's training program was inadequate for the tasks the officers were required to perform; (2) the inadequacy was the result of the City's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury.  *Russo v. City of*

14

*Cincinnati*, 953 F.2d 1036, 1046 (6th Cir. 1992).  The City can only be liable if their failure-to-train reflects a deliberate or conscious choice.  *City of Canton v. Harris*, 489 U.S. 378, 379 (6th Cir. 1989).

In taking the facts in a light most favorable to Plaintiffs, they are easily able to meet the first and third prongs of this test.  With respect to the first prong, the training program (or lack thereof) was arguably inadequate because the officers were never formally trained in AWS, even though there was a documented protocol that was to be followed for prisoners exhibiting signs of AWS; and they were required to medically evaluate prisoners upon intake and to monitor them during their stay.  With respect to the third prong, the failure-to-train the officers could have lead to the decedent's death because she may have lived had the officers been trained to recognize AWS (or to recognize the fact that she needed medical assistance) and they failed to do so.  With respect to the second prong of the test – whether the inadequacy was the result of the City's deliberate indifference – there are issues of fact for a jury.  Plaintiffs have presented evidence to withstand summary judgment.

First, there was a protocol for dealing with prisoners who exhibited signs of AWS, but none of the officers were ever trained in that protocol.  Second, the officers were arguably required to do some type of medical evaluation, but had never been trained in how to administer the screening procedures and had never been trained to apply or understand the standard protocols that were in place to govern medical care of detainees after they are screened.  Third, Frank testified that he should have been informed of the decedent's BAC, yet he admitted that

15

there were not protocols in place to require the transmittal of such information to him.[10]  Fourth, the medical information provided by the decedent's husband was never provided to Frank.  It appears that there was, at a bare minimum, a lack of communication between the officers and Frank.  This lack of communication, arguably, could have been alleviated had the officers been aware of and followed the protocols that were in place, or had there been additional protocols to deal with this type of situation.  Lastly, Plaintiffs have presented evidence that there were budgetary concerns that may (or may not have) contributed to the alleged failure-to-train on the part of the City.  Accordingly, a jury must decide if there was a failure-to-train in this case whether it was the result of the Defendants' conscious or deliberate choice.  The City's motion, therefore, is granted to the extent that Plaintiffs' Section 1983 claim is premised on an unconstitutional policy or custom, but denied as to their failure-to-train claim.

### B.  Defendants Frank and Ugrinic

While there may not be evidence that Defendants Ugrinic and Frank have personal liability under Section 1983, there is enough evidence in the record to create a genuine issue of material fact as to whether liability can be premised on their roles in this case, i.e. Frank's role as Director of Health and Ugrinic's role as the Chief of Police.  As stated above, there is enough evidence to present Plaintiffs' failure-to-train claim to a jury.  Accordingly, summary judgment for Defendants Frank and Ugrinic is denied.

### C.  Defendant Piazza

Defendants argue that summary judgment should be granted with respect to Piazza

---

[10]  Interestingly, Frank testified that he "would certainly" have been informed by the officers if there were concerns about a detainee's level of consciousness or awareness.  Yet, he was never informed of the decedent's BAC, despite the fact that it was a .342 and she was noted as being confused as to time, place or person on the jail medical screening form.

16

because there is no evidence to establish that he had knowledge of the decedent's serious medical needs.  As previously stated, to prevail on their claim of deliberate indifference, Plaintiffs must satisfy two tests – one objective and one subjective.  Undertaking this analysis, it is clear that the harm caused to the decedent was sufficiently serious – she died from an arguably preventable death.  As to whether Piazza possessed a sufficiently culpable state of mind, the Court finds that there is enough evidence in the record to preclude summary judgment.

Having reviewed the record in its entirety, the Court finds Defendants remiss in their statement that "at all times" the decedent appeared to be in no distress or in need of medical care or attention.  Notwithstanding her husband's call to the jail requesting that a doctor should be called and the decedent's elevated BAC, her intake screening form plainly indicates (in addition to a variety of serious ailments) that she was confused as to "time, place or person."  A paramedic squad was called when she was observed on the floor with a sock in her mouth (in what clearly appeared to be "distress") and she complained of feeling ill at court.  When she was transported to the hospital for her psychiatric evaluation, the nurse noted that she was shaking.  Furthermore, when she was discovered the following morning dead in her cell, she appeared to have been sweating profusely.  These facts plainly demonstrate that the decedent was not fine "at all times" as Defendants would like the Court to believe.  Accordingly, summary judgment as to Piazza is denied.

### D.  Defendants Kohanski, Clementi, and McMillin

Defendants argue that Kohanski, Clementi and McMillin are entitled to qualified immunity.  Qualified immunity protects government officials performing discretionary functions from civil liability, provided that their conduct does not violate clearly-established legal rights of

17

which a reasonable person would have known.  *See e.g. Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Birrell v. Brown*, 867 F.2d 956, 958 (6th Cir. 1989).  In order to determine whether Plaintiff's claims must be dismissed for qualified immunity, the Court must undertake a two-part analysis.

First, it must determine whether a constitutional right would have been violated on the facts as alleged.  *Saucier v. Katz*, 533 U.S. 194, 200 (2001).  Second, assuming a constitutional right was violated, the Court must determine whether the right was clearly established.  *Id.*  In order for a right to be clearly established, the law must be clear with respect to the official's particular actions in the particular situation.  *Black v. Parke*, 4 F.3d 442, 445 (6th Cir. 1993) (citation omitted).  Here, Defendants do not dispute that the right was clearly established and choose only to argue that no constitutional right was violated. Accordingly, the Court will focus its inquiry only on whether these Defendants were deliberately indifferent to the decedent's right to adequate medical care.

Again, undertaking this analysis, it is clear that the harm caused to the decedent was sufficiently serious.  As to whether these Defendants possessed a sufficiently culpable state of mind, the Court finds that there is no evidence that McMillin possessed such a state of mind. Plaintiffs offer little more than the fact that McMillin knew what was going on regarding Kohanski and Clementi's transport of the decedent from the jail to the hospital and back again. The record, however, is not so clear with respect to Kohanski and Clementi's subjective state of mind and the Court finds that a reasonable jury could find that these two Defendants possessed a sufficiently culpable state of mind.

To explain, both Kohanski and Clementi knew that the decedent had a high BAC level

18

and they knew she was not feeling well at court and that a squad was called.  More importantly, however, they appear to have known that her release was AMA, yet they failed to mention this to their supervisors or to the court that ordered her release.  Because deliberate indifference requires that the officers knew of and disregarded a substantial risk of serious harm to the decedent, a jury could reasonably find that Kohanski and Clementi's decision to remove the decedent from the hospital (or at the very least fail to notify their supervisors or the court that the release was against AMA) shows that they were aware of facts with which the inference could be drawn and that they also drew the inference.  Accordingly, the Court cannot find Defendants Kohanski and Clementi immune from liability as a matter of law and denies their request for summary judgment.  Qualified immunity does, however, protect Defendant McMillin from liability and the Court grants his motion for summary judgment on Plaintiffs' federal claim.

### V.  Plaintiffs' State Law Claims

**A.     Wrongful Death & Willful or Wanton Misconduct Claims**

Defendants seek summary judgment on Plaintiffs' wrongful death and willful or wanton misconduct claims.  According to Defendants, summary judgment should be granted due to the lack of evidence establishing proximate cause.  Plaintiffs, on the other hand, argue that they have presented evidence of proximate cause sufficient to overcome Defendants' motions; and the Court agrees.

In Ohio, proximate cause is normally a question for the jury and only where there is no evidence to establish causation must the court grant a motion for summary judgment.  *See e.g. Strother v. Hutchinson*, 423 N.E.2d 467, 471 (Ohio 1981).  To establish proximate cause, a plaintiff must show that "the negligent act in a natural and continuous sequence produces a result

19

which would not have taken place without the act." *Id.* (quoting *Clinger v. Duncan*, 141 N.E.2d 156 (Ohio 1957)). In other words, Plaintiffs must show that the decedent would have survived but for Defendants' failure to provide her with adequate medical care.

That Plaintiffs' theory of the case changed slightly is irrelevant. In other words, the issue that remains is whether the decedent would have survived had she received medical care. And, this very issue remains regardless of whether the cause of death was major alcohol withdrawal or an electrolyte imbalance. Defendants portray Plaintiffs' expert's change in opinion as catastrophic to Plaintiffs' case. According to them, major alcohol withdrawal would cause physical symptoms of an obvious nature; whereas, an electrolyte imbalance would be detectable only through a chemical profile. Defendants, however, overlook the other evidence in the record that a jury might find indicated a need for medical treatment, such as the level of the decedent's BAC, the fact that certain photographs indicated that she was sweating, and the fact that she was observed on the floor with a sock in her mouth. Moreover, Defendants fail to recognize that Plaintiffs' expert did opine that the decedent would likely have survived if she was in a hospital, which creates an issue of fact.

Defendants are correct in noting that prison officials are not insurers of an inmate's safety and well-being, but they fail to mention that they still owe an inmate the duty of reasonable care. *Williams v. Southern Ohio Correctional Facility*, 587 N.E.2d 870, 876 (Ohio 1990). The precise issue in this case is whether the care afforded to the decedent was reasonable in light of facts and circumstances. After examining the record, the Court finds that it is not beyond reason that a jury, when looking at all the facts and circumstances surrounding this unfortunate incident, could find in Plaintiffs' favor on their state law claims. Accordingly, Defendants' motions are denied

20

on these claims.

**B.      Conscious Pain and Suffering**

Defendants seek summary judgment on Plaintiffs' claim for conscious pain and suffering. According to Defendants, there is no evidence to establish that the decedent experienced conscious pain and suffering prior to her death because all of the evidence indicates that she died in her sleep.  Because Plaintiffs have pointed to no evidence to the contrary, Defendants' motions are granted on this claim.

**VI.  Conclusion**

The premise of Plaintiffs' claim is that had the officers been trained in how to deal with a person with AWS, the decedent's death may have been preventable.  Defendants argue that none were aware that the decedent was suffering from AWS (and a jury may agree); however, there is evidence in the record that the decedent had at least some of the signs of AWS.  Because of this evidence, it is possible that a jury will find that Defendants were aware, but chose to ignore, the signs that the decedent was in need of medical care.  Should the jury find that the Defendants knew that the decedent was in need of medical care, but chose to wait until some manifest emergency, Defendants can be found to have been deliberately indifferent to her constitutional rights and/or liable for her allegedly wrongful death. Whether each of the Defendants had the requisite knowledge of the seriousness of the decedent's medical needs and whether each of the Defendants violated her constitutional rights and/or breached a duty under state law is for a jury to decide.  For the reasons stated herein, Defendants' motions for summary judgment are GRANTED in part and DENIED in part.  The motions are granted on Plaintiffs' state law claim for conscious pain and suffering and to the extent that Plaintiff's Section 1983 claim alleges an

21

unconstitutional policy or custom.  Summary judgment is granted for Defendant McMillin on

Plaintiffs' federal claim because the Court has found him entitled to qualified immunity.  In all

other respects, however, Defendants' motions are denied.


      IT IS SO ORDERED.

    January 20, 2006                          *s/John R. Adams*           
Date                                              John R. Adams
                                              U.S. District Judge